## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

SUZANNE STILL,

      *Petitioner*,

    v.

U.S. DEPARTMENT OF LABOR, *et al.*

      *Respondents.*

</td><td>

No. 17-cv-1420 (DLF)

</td></tr>
</table>

## MEMORANDUM OPINION

The Energy Employees Occupational Illness Compensation Program Act of 2000 (EEOICPA), 42 U.S.C. § 7384 *et seq.*, provides compensation to individuals, and their eligible survivors, who were injured by radiation in certain Department of Energy (DOE) facilities. *See id.* § 7384d(b). In this case, petitioner Suzanne Still challenges the decision of the Department of Labor (DOL) and the Department of Health and Human Services (HHS) to deny compensation related to her husband's death from brain cancer. *See* Second Am. Pet. ¶ 3, 11–12, Dkt. 25. She argues that the National Institute of Occupational Safety and Health (NIOSH), a component agency of HHS, violated its own regulations in estimating the radiation to which her husband was exposed. *Id.* ¶¶ 42, 133–34.

Before the Court are the petitioner's Motion for Summary Judgment, Dkt. 30, and the government's Cross-Motion for Summary Judgment, Dkt. 31. For the reasons that follow, the Court will grant the government's motion and deny the petitioner's motion.

I.      **BACKGROUND**

A.      **Statutory and Regulatory Background**

Congress passed the EEOICPA in 2000 to ensure that former DOE workers who "performed duties uniquely related to the nuclear weapons production and testing programs" receive "efficient, uniform, and adequate compensation for . . . radiation-related health conditions."  42 U.S.C. § 7384(a)(8).  Under Part B of the EEOICPA, covered employees or their eligible survivors can receive up to $150,000 of compensation for certain covered illnesses caused by exposure to radiation at DOE facilities.  *See id.* §§ 7384*l*–84w-1.

An individual seeking compensation under EEOICPA must file a claim with the DOL's Office of Workers' Compensation Programs (OWCP).  *See* Exec. Order No. 13,179, 65 Fed. Reg. 77,487 (December 7, 2000); 20 C.F.R. §§ 30.100–01.  To establish eligibility for compensation under Part B, the employee or survivor must show (1) that the employee was diagnosed with cancer; (2) that he was a DOE employee or contractor who was diagnosed with cancer after employment at a covered facility; and (3) that the cancer was "at least as likely as not" related to his employment at the covered facility.  20 C.F.R. § 30.210(a).

To determine whether it is "at least as likely as not" that a DOE employee's illness was related to his employment at a DOE facility, OWCP transfers relevant information about the employee to NIOSH to perform a "dose reconstruction."  *See id.* § 30.115.  Dose reconstructions are "reasonable estimates of the radiation doses received by individuals . . . for whom there are inadequate records of radiation exposure."  65 Fed. Reg. at 77,488.  In the ordinary case, NIOSH measures the radiation an individual received in part through "individual monitoring data," 42 C.F.R. § 82.15, including wearable dosimeters, *id.* § 82.14(b)(1).  In cases where such data is "incomplete," NIOSH "estimate[s] the missing component of dose . . . based on interpolation,

using available monitoring results from other time periods close to the period in question, or based on monitoring data on other workers engaged in similar tasks." *Id.* § 82.16(a); *see also* 42 U.S.C. § 7384n(d) (requiring the President to "establish by regulation methods for arriving at reasonable estimates of the radiation doses" received by employees who were "not monitored for exposure," who were "monitored inadequately," or "whose records of exposure . . . are missing or incomplete"). NIOSH has issued site-specific guidance to guide those estimates. *See*, *e.g.*, Technical Information Bulletin, OCAS-TIB-007 (Oct. 15, 2007), *available at* HHS A.R. 2480–85. And when there is uncertainty in a given estimate, the agency applies assumptions that give claimants "the benefit of the doubt." 42 C.F.R. § 82.19.

Based on the dose reconstruction report it receives from NIOSH, "together with information on cancer diagnosis and other personal information provided to DOL by the claimant," OWCP calculates the approximate likelihood that exposure to radiation at a DOE facility caused the employee's cancer. *Id.* § 82.4. In determining the probability of causation, OWCP is required to use the dose reconstruction provided by NIOSH. *See* 20 C.F.R. § 30.318; 42 C.F.R. § 81.6. If the probability of causation is equal to or greater than fifty percent, it is "at least as likely as not" that exposure to radiation at a DOE facility caused the cancer, such that the claimant is eligible for compensation. 20 C.F.R. § 30.213(b).

After determining whether the causation threshold is met, OWCP issues a recommended decision regarding the claimant's compensation. *See id.* § 30.300. A claimant may challenge the recommended decision within sixty days by filing an objection with OWCP's Final Adjudication Branch (FAB). *See id*. § 30.310. FAB then issues a "final decision," but the claimant may request reconsideration of that decision within thirty days and the Director of the Division of

Energy Employees Occupational Illness Compensation (DEEOIC) can reopen the claim as a matter of discretion. *Id.* §§ 30.316, 30.319, 30.320.

### B.     Factual Background

Still's husband was employed from January 1, 1974, until November 1, 1999, at a DOE facility engaged in the production of nuclear weapons. *See* Labor A.R. 166; Second Am. Pet. ¶ 4.  During his life, he was diagnosed with four skin cancers, a blood cancer, and a brain cancer. *See* Second Am. Pet. ¶¶ 5–6.  He died of the latter on September 29, 2014. *Id.* ¶ 5.

Still filed her initial compensation claim with OWCP on October 10, 2014. *See* Labor A.R. 166.  OWCP referred the claim to NIOSH, which issued a dose reconstruction report on December 10, 2014. *See id.*  Based in part on this first report, OWCP denied Still's claims in a final decision dated December 27, 2016, and denied her request for reconsideration on May 18, 2017. *See id.*  On November 22, 2017, however, the DEEOIC vacated OWCP's December 27, 2016, final decision and its May 18, 2017, denial of reconsideration. *See id.*  According to OWCP, the Director vacated the decisions so that OWCP "could conduct further development of . . . Still's survivor claim, including another referral to [NIOSH] for a rework of the prior December 10, 2014 dose reconstruction . . . , and to address each of the technical objections that she had previously raised in relation to" that dose reconstruction. *Id.* at 166–67.

NIOSH compiled a draft of its reworked dose reconstruction report, which responded to Still's thirteen technical objections to the original dose reconstruction report, and ultimately concluded that there was only a 33.72% chance that radiation exposure at a DOE facility had caused her husband's cancer. *Id.* at 167–70.  NIOSH sent Still a draft of its reworked report and offered her the opportunity to raise any objections to it. *See id.* at 167.  On April 16, 2018, Still declined to do so, and signed NIOSH's Form OCAS-1, certifying that she did not have any

4

further information to provide to NIOSH for its use in completing the dose reconstruction.  *See id.*

Based on the reworked dose reconstruction, OWCP concluded that it was not "at least as likely as not" that Still's husband's cancer was caused by radiation exposure at his workplace; accordingly, on September 10, 2018, OWCP issued a recommended decision denying Still's Part B claim.  *Id.* at 170.  Still did not submit objections to this recommended decision.  *See id.*  On November 19, 2018, FAB issued a final decision denying her Part B claim.  *See id.* at 166.

Still then submitted a request for reconsideration of the November 19, 2018, final decision, along with her objections to that decision.  *See id.* at 163.  In assessing whether to grant Still's request for reconsideration, FAB consulted a health physicist within the DEEOIC who reviewed Still's objections to the November 19 decision.  *See id.* at 5.  The health physicist concluded that NIOSH had followed standard dose reconstruction procedures in assessing Still's claim, and FAB accordingly concluded that there was no basis to reconsider the decision.  *See id.* at 6–7.  FAB denied Still's request for reconsideration on March 5, 2019.  *See id.* at 4.

### C.    Procedural History

On July 17, 2017, Still filed her original petition in this Court, which invoked a cause of action under the Administrative Procedure Act (APA), *see* 5 U.S.C. § 701 *et seq.*, listed both DOL and NIOSH as respondents, and primarily challenged NIOSH's 2014 dose reconstruction. *See* Pet. ¶¶ 5, 18, Dkt. 1.  On December 29, 2017, the parties filed a joint motion to stay all proceedings while DOL completed its re-adjudication of Still's claims.  *See* Joint Mot. to Stay, Dkt. 13.  The parties also stipulated, without explanation, to the dismissal of NIOSH from the case.  *See id.*  This Court both granted the motion to stay and dismissed NIOSH without

prejudice.  *See* Min. Order of Dec. 30, 2017.  On April 4, 2019, following the re-adjudication of

Still's claims, the Court lifted the stay at the parties' request.  *See* Min. Order of Apr. 4, 2019.

Still filed her first amended petition on June 27, 2019.  She argued that NIOSH violated

its own guidelines by failing to assign doses of neutrons, tritium, and strontium in her husband's

dose reconstruction.  *See* First Am. Pet. ¶¶ 63, 102, 106, Dkt. 18.  In particular, she argued that

NIOSH violated the guidance outlined in OCAS-TIB-007, which provides that NIOSH must

assess three factors in deciding whether to assign neutron doses: (1) the employee's work

location, (2) the employee's job description, and (3) whether the employee "has a measured

photon dose."  HHS A.R. 2484.  For a remedy, Still asked the Court to both set aside DOL's

November 19, 2018, decision and order the agency to "obtain a proper Dose Reconstruction from

NIOSH."  First Am. Pet. at 28.

On July 25, 2019, DOL moved to dismiss Still's petition.  *See* Resp'ts' Mot. to Dismiss,

Dkt. 20.  This Court granted that motion upon finding that Still lacked Article III standing.  *See*

Mem. Op. and Order of April 13, 2020, Dkt. 24.  In doing so, the Court reasoned that Still's

requested relief was "unlikely to redress her particularized injury," first, because that injury

stemmed from a calculation by NIOSH; second, because NIOSH was no longer a party to the

suit; and third, because DOL, "the only remaining agency respondent . . . [was] legally required

to accept the dose reconstruction as NIOSH calculates it."  *Id.* at 7.  The Court separately noted

that Still "may file an amended petition adding NIOSH as a respondent."  *Id.* at 9.

Still filed a second amended petition on May 15, 2020, which lists both DOL and HHS as

respondents.  *See* Second Am. Pet. ¶¶ 1–3, 133–34.  Like its predecessor, the petition argues that

NIOSH erred in failing to include doses of neutrons, tritium, and strontium in her husband's dose

reconstruction.  *Id.* ¶¶ 109, 118, 123.  For a remedy, the petition seeks not only to set aside that

reconstruction, but also to "compel HHS . . . to prepare a reworked dose reconstruction that complies with both the technical language and the intent of the NIOSH guidance documents, EEOICPA rules and regulations, and the EEOICPA statute." *Id.* at 32.  It further requests "that this Court compel the DOL to carefully review the HHS/NIOSH dose reconstruction, once the rework of that dose reconstruction is completed, and adjudicate Mrs. Still's claim based only on a legally and properly prepared dose reconstruction." *Id.*

On August 31, 2020, Still moved both for summary judgment and to compel the conduct described above.  *See* Pet'r's Mot. for Summ. J., Dkt. 30.  She argues that NIOSH should have attributed neutron doses to her husband but does not mention tritium or strontium.  *See* Pet'r's Mem. in Supp. of Summ. J. at 14–15, Dkt. 30-2.  The government cross-moved for summary judgment on October 16, 2020.  *See* Resp't's Cross-Mot. for Summ. J., Dkt. 31.  Both motions are now ripe for review.

## II.   LEGAL STANDARD

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one with potential to change the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90

(D.D.C. 2006).  The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

In an arbitrary and capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  This Court's review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise."  *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted).  The court "is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (internal quotation marks omitted).  When reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (internal quotation marks omitted).  For example, an agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  The party challenging an agency's action as arbitrary and capricious bears the burden of proof.  *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015) (citation omitted).

In addition, "[t]he *Accardi* doctrine requires federal agencies to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions."  *Steenholdt v. FAA*,

314 F.3d 633, 639 (D.C. Cir. 2003) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)); *see also Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("[A]gencies may not violate their own rules and regulations to the prejudice of others."). As a general matter, a rule is subject to *Accardi* if it limits the agency's discretion and imposes "rights or obligations on the respective parties." *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987); *see also Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018). When an agency violates such a rule, the usual remedy is to set aside the agency's action. *See, e.g.*, *Accardi*, 347 U.S. at 268; *Service v. Dulles*, 354 U.S. 363, 388–89 (1957).

## III.   ANALYSIS

### A.   The Petitioner's Claim is Reviewable

Before reaching the merits of Still's claim, this Court must first determine whether Still has Article III standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). DOL and HHS argue that Still lacks standing, first, because she has not suffered a concrete injury; second, because there is no causal link between any error in her dose reconstruction and the denial of her Part B claim; and third, because remanding NIOSH's decision would not entitle her to benefits. *See* Resp'ts.' Mem. in Supp. of Cross-Mot. for Summ. J. at 13–16, Dkt. 31-1. The government also argues that Still lacks a cause of action under the APA because she does not challenge a "final agency action." *See id.* at 17–19. This Court will resolve both these issues in Still's favor and reach the merits of her petition.

#### 1.  Article III Standing

To establish standing, Still must demonstrate that she has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).

She must also establish that there is "a causal connection between the injury and the conduct complained of" and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (internal quotation marks and citation omitted). Each of these elements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.* at 561. As such, at the summary judgment stage, Still "can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal quotation marks and citation omitted).

Still has adequately established an injury in fact. As a general matter, "a plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement . . . if that requirement was 'designed to protect [the plaintiff's] threatened concrete interest.'" *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (quoting *Lujan*, 504 U.S. at 573 n.8). Here, "the EEOICPA confers the concrete benefit of compensation to qualifying claimants," *Young v. U.S. Dep't of Labor*, No. 17-cv-2428 (JDB), 2020 WL 1557170, at *7 (D.D.C. Apr. 1, 2020) (emphasis omitted), and Still argues that NIOSH's failure to follow its own procedures deprived her of that compensation, *see* Pet'r's Suppl. Mem. at 8, Dkt. 40. The loss of compensation is a concrete injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). This Court has found a cognizable injury in nearly identical circumstances. *See Young*, 2020 WL 1557170, at *7 (holding that "a procedural injury in the adjudication of plaintiffs' EEOICPA compensation claim satisfies the injury-in-fact requirement"). And the government has offered no basis for distinguishing *Young* here.[1]

---

[1] The government argues that Still lacks an injury in fact because no NIOSH procedure requires including neutron doses in the disputed dose reconstruction. *See* Resp'ts' Reply at 2, Dkt. 36. But "when considering whether a plaintiff has Article III standing, a federal court must assume,

Still has also established a "causal connection between [her] injury and the conduct complained of." *Lujan*, 504 U.S. at 560. "Establishing causation in the context of a procedural injury requires a showing of two causal links." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017). First, the party seeking to establish standing must "connect[] the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement]." *Id.* (second and third alterations in original) (quoting *Fla. Audubon*, 94 F.3d at 668). And second, the party must connect that "substantive decision to the [his] particularized injury." *Id.* (quoting *Fla. Audubon*, 94 F.3d at 668). Crucially, the first link does not require showing that the agency "would have reached a different substantive result" "but for the alleged procedural deficiency." *Id.* All that is necessary is to show a "substantial probability" of that outcome. *Fla. Audubon*, 94 F.3d at 666.

Still has met that standard here. First, she has shown a substantial probability that, if NIOSH had attributed neutron doses to her husband, the resulting dose reconstruction would have been sufficient to find it "at least as likely as not" that his employment caused his brain cancer. 20 C.F.R. § 30.210(a)(2)(ii). Excluding those neutron doses, OWCP calculated a 33.72% chance that Still's husband's cancer was attributable to his employment. *See* Labor A.R. 170. One input to that calculation was NIOSH's finding that Still's husband was exposed to 2.429 rem of radiation.[2] *See id.* at 41. If NIOSH had also assigned him neutron doses, Still

---

*arguendo*, the merits of his or her legal claim," which, in this context, include Still's characterization of NIOSH's procedures. *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) (citing *Warth v. Seldin*, 422 U.S. 490, 501–02 (1975)).

[2] A rem is a unit for measuring radiation, equal to the "quantity of ionizing radiation having the same effect on human tissue as one roentgen of X-rays." *Rem*, Oxford English Dictionary (3d ed. 2009). In conducting a dose reconstruction, NIOSH estimates the radiation "to the organ associated with the specific cancer"—here, the brain. Labor A.R. 41.

argues that the agency would have calculated those doses by extrapolating from his deep dose photon exposure of 0.286 rem, *see* HHS A.R. 2010, and that it would have used a neutron-to-photon ratio of 5.05, *see id.* at 2712.  *See* Pet'r's Supp. Mem. at 4–5.  That approach would have increased her husband's total radiation exposure by 1.444 rem, which is a 59% increase over the prior amount.  *See id.* at 5.  The Court finds it substantially probable that a 59% increase in radiation exposure would bring OWCP's probability calculation from 33.72% to at least 50%, thereby clearing the threshold that *Florida Audubon* requires.[3]

In response, the government argues that Still used the wrong ratio of neutrons to photons. To begin, it argues that the ratio of 5.05 applies only to "production workers who [directly] processed plutonium," not truck drivers like Still's husband.  *See* Resp'ts' Suppl. Mem. at 4 & n.4, Dkt. 41.  From there, the government argues that Still's husband would receive a less favorable ratio because of year-to-year changes in his "work locations," "job type," and "measured deep dose[s]" of photons.  *Id.* at 4–5.  But regardless of whether the government correctly weighed those factors, this Court must assume the merits of Still's legal claim in assessing her Article III standing.  *See Parker v. Dist. of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007).  And Still's lead argument on the merits is that those same factors—"[w]ork location," "[j]ob description, and "measured photon dose[s]," HHS A.R. 2484—require assigning a neutron dose to her husband.  *See* Pet'r's Mem. in Supp. at 14–15.  Had Still prevailed on that argument below, there is a substantial probability that NIOSH would have used a claimant-friendly ratio of neutrons to photons.  And if Still prevails on that argument here, the considerable overlap

---

[3] The government objects that Still raised this argument for the first time in supplemental briefing.  *See* Resp'ts' Suppl. Mem. at 3, Dkt. 41.  But this Court has an independent obligation to raise and resolve jurisdictional issues *sua sponte*.  *See Kontrick v. Ryan*, 540 U.S. 443, 455 (2004).  And Still filed her supplemental briefing both in furtherance of that obligation and at this Court's request.  *See* Min. Order of Sept. 13, 2021.

between the assignment and ratio questions would likely require NIOSH to do the same.  For

those reasons, this Court adopts Still's proposed ratio of 5.05, which is also consistent with

NIOSH's directive to use claimant-friendly assumptions, *see* 42 C.F.R. § 82.19, and *Florida*

*Audubon*'s clarification that plaintiffs in this circumstance need only show a "substantial

probability" of causation, *see* 94 F.3d at 666.

The government's remaining argument on this issue does not persuade.  In its opening

brief, the government cited a comment by a DOL health physicist that the "small amount of

neutron dose cited by . . . [Still] would have little to no impact on the [dose reconstruction]."

Resp'ts' Mem. in Supp. at 15 (citing HHS A.R. 764).  In her supplemental brief on causation,

Still represented that this comment concerned only the radiation to which her husband was

exposed in 1985 and 1986.  *See* Pet'r's Suppl. Mem. at 5 (citing Labor A.R. 10,241).  The Court

agrees with Still's characterization of that comment.  And in any event, because the government

did not address the point in its supplemental brief, *see* Resp'ts' Suppl. Mem. at 6–7, the Court

considers the initial argument abandoned.  *See Queen v. Schultz*, 310 F.R.D. 10, 22 (D.D.C.

2015).  Accordingly, the Court determines that Still has connected the challenged dose

reconstruction to a "government decision that may have been wrongly decided" on account of

that reconstruction.  *Ctr. for Biological Diversity*, 861 F.3d at 184 (quoting *Fla. Audubon*, 94

F.3d at 668).

Having established the first link of the *Florida Audubon* test, the remainder of the

causation analysis is straightforward.  If OWCP had found at least a 50% chance that Still's

husband developed cancer because of his employment, it is undisputed that he would qualify as a

"covered employee" under the EEOICPA.  And in that event, federal law would unambiguously

entitle Still to compensation.  *See* 42 U.S.C. § 7384s(a)(1) (providing that survivors of "covered

employee[s] . . . shall receive compensation"). Accordingly, it is "substantially probable that the procedural breach . . . cause[d] the essential injury to the plaintiff's own interest." *Fla. Audubon*, 94 F.3d at 665.

The same considerations explain why it is "likely, as opposed to merely speculative, that [Still's] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted). To establish redressability in this context, Still need not show that complying with its own guidance "would alter" NIOSH's decision. *Ctr. for Biological Diversity*, 861 F.3d at 185 (citation omitted). Instead, it is enough to show "at least the possibility" that NIOSH "could reach a different conclusion" that would redress her injury. *Id.* That condition is satisfied here because, as discussed above, there is a substantial possibility that attributing neutron doses to Still's husband would raise his probability-of-causation score to 50%, and thereby entitle Still to compensation.

It is "no obstacle to standing" that no single "actor [is] responsible for [both] the procedural defect and the injurious final agency action." *Young*, 2020 WL 1557170, at *9 (quoting *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005)). To be sure, DOL, not NIOSH, denied Still's claim for compensation. But even though NIOSH's calculation did not "directly result in the denial of [Still's] claim," Still has a "concrete interest in ensuring a lawful dose reconstruction process because [NIOSH]'s dose estimates will affect DOL's [ultimate] assessment" of her claim. *Id.* Indeed, federal regulations require DOL to accept NIOSH's dose reconstructions. *See* 42 C.F.R. § 81.6. And as discussed above, Still has made a substantial showing that NIOSH's calculation determined the DOL's decision to deny her claim.

For the reasons above, the Court concludes that Still has established a concrete injury that is fairly traceable to her challenged conduct and would likely be redressed by a favorable

decision on the merits.  *See Lujan*, 504 U.S. at 560–61.  She accordingly has Article III standing.

      2. *Finality*

      The Court may now address the government's argument on finality.  Absent exceptions not relevant here, *see* 5 U.S.C. § 701(a), the APA authorizes judicial review of all "final agency action for which there is no other adequate remedy in a court," *id.* § 704.  An agency action is "final" if it "mark[s] the consummation of the agency's decisionmaking process," and if it is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted).  In this action, Still challenges the manner in which NIOSH performed her husband's dose reconstruction.[4]  *See* Pet'r's Mem. in Supp. at 18–32.  Contrary to the government's submission, *see* Resps.' Mem. in Supp., at 17–19, the Court will conclude that this dose reconstruction was a "final agency action," 5 U.S.C. § 704.

      To begin, the completion of the dose reconstruction marked the consummation of NIOSH's decisionmaking.  *See Bennett*, 520 U.S. at 177–78.  Upon submitting that reconstruction to DOL, NIOSH completed its role in the EEOICPA process.  *See* 20 C.F.R. § 30.318; 42 C.F.R. § 82.4.  "There [was] simply nothing left for the [agency] to do."  *Anacostia Watershed Soc. v. Babbitt*, 871 F. Supp. 475, 480 (D.D.C. 1994).  And although the reconstruction did not finally resolve Still's claim for compensation, an "agency's decision may still be final even if it is made to inform another agency's decision, which will in turn impact plaintiffs' concrete interests."  *Young*, 2020 WL 1557170, at \*12 (citing *Chem. Mfrs. Ass'n v.*

---

[4] At times, Still appears to challenge DOL's decision to adopt NIOSH's dose reconstruction. *See, e.g.*, Pet'r's Reply at 24.  But because DOL is "legally required to accept the dose reconstruction as NIOSH calculates it," Still lacks standing to challenge that decision.  *See* Mem. Op. and Order of April 13, 2020, at 7.

*EPA*, 26 F. Supp. 2d 180, 183 (D.D.C. 1998)).  That description applies here.

The dose reconstruction is also a decision "from which legal consequences [have] flow[ed]."  *Bennett*, 520 U.S. at 178.  "[W]hether an agency action has direct and appreciable legal consequences is a 'pragmatic' inquiry."  *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016)).  In conducting that inquiry, the D.C. Circuit considers the "concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it."  *Id.*  Here, federal law requires DOL to adopt NIOSH's dose reconstruction.  *See* 20 C.F.R. § 30.318; 42 C.F.R. § 81.6.  Still has shown a substantial probability that the reconstruction's outcome determined the outcome of her EEOICPA claim.  And in any event, an agency action may be final under § 704 even if its consequences are not "certain."  *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 958 (D.C. Cir. 2019).  In *Ipsen*, the D.C. Circuit held that an agency's communications were final agency action in part because they increased a company's "*risk* of incurring penalties in a future enforcement proceeding."  *Id.*  Likewise, in this case, an unfavorable dose reconstruction "increased the probability that [Still's] claims for compensation will be denied."  *Young*, 2020 WL 1557170, at *12 (citing *Ipsen*, 943 F.3d at 956–57).  That is enough, in the Court's view, to satisfy § 704.

The government's remaining arguments on finality do not persuade.  First, the government notes that DOL can deny an EEOICPA claim without even considering a dose reconstruction, for instance, if a claimant was never diagnosed with cancer, *see* 20 C.F.R. § 30.210(a)(1).  *See* Resp'ts.' Mem. in Supp. at 17.  But as discussed above, agency action may be final if it increases the "*risk*" an unfavorable result, even if a separate action effects that result.  *Ipsen*, 943 F.3d at 958.  Next, the government cites an out-of-district case that found dose

reconstructions to be unreviewable because "[n]o claim for compensation can be granted or denied on . . . a dose reconstruction alone," *Harger v. DOL*, No. 06-cv-5071, 2010 WL 395768, *3 (E.D. Wash. Jan. 25, 2010).  *See* Resp'ts.' Mem. in Supp. at 18.  But *Harger* is inconsistent with *Ipsen*, which controls here.  And because DOL is required to adopt NIOSH's dose reconstructions, *see* 20 C.F.R. § 30.318, classifying those decisions as nonfinal would have the unusual result of entirely insulating them from judicial review, *see Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (discussing "the presumption favoring judicial review of administrative action").  Finally, the government relies on *Industrial Customers of Northwest Utilities v. Bonneville Power Administration*, 408 F.3d 638 (9th Cir. 2005), which held that rates set by a regional regulator were not final because they only gained the force of law with the Federal Energy Regulatory Commission's approval, *id.* at 646–47.  *See* Resp'ts.' Mem. in Supp. at 18–19.  But the Commission had discretion to "affirm or remand" those rates, *id.* at 644 (citing 16 U.S.C. § 839e(a), (k)), and that discretion distinguishes *Bonneville Power* from the instant case.  Accordingly, for all the reasons above, this Court holds that NIOSH's dose reconstruction constitutes "final agency action."  5 U.S.C. § 704.

### B.     NIOSH Followed Its Own Regulations

On the merits, Still argues that the agency failed to follow its own regulation, OCAS-TIB-007, in deciding whether to assign neutron doses to her husband.  *See* Pet'r's Mem. in Supp. at 14–15.  By way of background, Still's husband worked as a truck driver at DOE's Savannah River Site from 1974 to 1999.  *See* Labor A.R. 166.  Between 1971 and 1989, that Site did not collect any individual monitoring data on neutron exposure to non-routine workers, including truck drivers.  HHS A.R. 2483.  Accordingly, to estimate any "missing" dose that such workers received during that period, 42 U.S.C. § 7384n(d), NIOSH promulgated OCAS-TIB-007, which

"provides guidance on when neutron exposures should be included" in those workers' dose reconstructions, HHS A.R. 2480.  This case concerns subsection 3.1 of that regulation, which concerns the assignment of neutron doses to non-routine employees, like Still's husband, who were monitored for photon exposure but not neutron exposure.  *Id.* at 2483.

The relevant portion of section 3.1 provides:

The following criteria should be met in determining whether neutron doses should be added.

1.  Work location – If the work location is any of the areas noted in section 2.1, then neutron exposes should be considered providing the other criteria are met.

2.  Job Description (Classification) or CATI – If either the job description of the CATI indicates a type of work that could result in only intermittent exposure to neutrons in an area listed in section 2.1, then neutron exposure should be considered.  An example of a job type that might result in intermittent neutron exposure would be quality control/production inspector or inventory/accountability clerk.

3.  Positive Photon Exposure – The energy employee has a measured photon dose (not missed dose).

HHS A.R. 2484.  In brief, the section instructs NIOSH to consider three criteria in deciding whether to assign neutron doses: (1) the employee's work location, (2) the employee's job description, and (3) whether the employee has a documented exposure to photons.  *See id.*  The first sentence of the section, which states that the "following criteria *should be met* in determining whether neutron doses should be added," conditions adding neutron doses on the satisfaction of all three criteria.  *Id.* (emphasis added).  The text of the first criterion—which ends, "providing the other criteria are met"—confirms that requirement.  *Id.*

NIOSH considered each of those criteria in declining to assign a neutron dose to Still's husband.  *See* HHS A.R. 150.  First, the agency determined that the first condition—work location—cut against that assignment:  Because "Mr. Still was a truck driver during his

employment," the agency found that his "employment record and job function did not indicate

that he worked in a capacity or area with potential for neutron exposure, such as working closely

with plutonium . . . as a production worker, or as a maintenance worker in the crane wash area of

the [nuclear] reactor." *Id.* To be sure, the agency acknowledged that Still's husband worked in

one of the "areas noted in section 2.1" of OCAS-TIB-007, HHS A.R. 2284—*i.e.*, the HB Line

labeled 221H, *see* HHS A.R. 150. But "as a truck driver," NIOSH reasoned, he "would likely

only have been in the H Area [] vicinity occasionally"—*e.g.*, for the purpose of loading and

unloading materials to be shipped. *Id.*; *see* Pet'r's Mem. in Supp. at 23 (noting that his duties

including "[w]ork[ing] with material being shipped out of 221H" (quoting HHS A.R. 11,338)).

For that reason, NIOSH concluded, "he would have an extremely low probability of having any

detectable neutron dose." HHS A.R. 150.

NIOSH also found that the second of the above criteria—job description—cut against

assigning a neutron dose. As recounted above, NIOSH reasoned that working as a truck driver

limited Still's husband's exposure to neutron radiation. *See id.* It also remarked that an

individual "monitoring program implemented during Mr. Still's employment period . . . elected

not to monitor non-production workers with job titles such as truck driver[], janitor[], and

security guard[] because these workers . . . were determined to have an extremely low probability

of having neutron exposure due to their job functions and locations." *Id.* This comment

distinguishes the role of a truck driver from the job functions listed in section 3.1 of OCAS-TIB-

007—*i.e.*, "quality control/production inspector or inventory/accountability clerk." HHS A.R.

2484. To be sure, Still reads the comment to repudiate OCAS-TIB-007, on the ground that "the

whole purpose of [the regulation] is to address the insufficiency of the [Site's] monitoring

program . . . between 1971 and 1989." Pet'r's Mem. in Supp. at 21. But the plain text of the

comment refers to a program "implemented during Mr. Still's employment," not before his employment began.  HHS A.R. 150.  That program appears to be the 1989 increase in the monitoring of Savannah River employees.  *See* HHS A.R. 2483 ("Starting around 1989, [the Savannah River Site] adopted the DOE criteria of monitoring workers who had a potential of exceeding 100 mrem/year.").  And the decision not to monitor truck drivers even after 1989 materially supports NIOSH's dose reconstruction.

Finally, NIOSH addressed whether Still's husband had measured photon doses.  The agency began by noting that "[p]ositive photon exposure is just one factor in determining neutron dose assignment." *Id.* at 150.  It then stated that "Mr. Still's dosimetry records indicate that he received mostly zero readings during his career and that most of the positive readings were at (or near) the minimum detection level." *Id.*  That statement accurately describes the record.  During his career with the DOE, Still's husband received 48 measured readings and 76 zero or missed readings.[5] *Id.* at 2011–14.  Also, 13 of the measured readings were for 5 mrem of shallow photon exposure, which appears to be the "minimum detection level" referenced in NIOSH's decision, and 28 of the readings were for 10 mrem or fewer.  *See id*.  On that basis, NIOSH found that the "measured photon doses . . . do not . . . warrant[] a neutron dose assignment." *Id.* at 150.

For the reasons above, the Court finds that NIOSH followed the plain terms of OCAS-TIB-007.  The agency carefully reviewed each of the criteria in section 3.1 of that regulation.  It did not consider irrelevant information.  *See id.*  And after finding that each of the relevant criteria weighed against a neutron dose, it declined to assign one.  The Court accordingly

---

[5] OCAS-TIB-007 refers to "missed doses," which are "dose[s] that [are] potentially undetected because of the detection limits of monitoring technology and procedures."  67 Fed. Reg. 22,314, 22,323 (May 2, 2002).  A missed dose is not a measured dose.  *See* HHS A.R. 2484

disagrees with Still's assertion that NIOSH "[did] not address any of the three criteria" in OCAS-TIB-007.  Pet'r's Mem. in Supp. at 20.

Still's other *Accardi* arguments also fail.  First, OCAS-TIB-007 does not require weighing its third criterion in Still's favor.  *See id.* at 22.  Although her husband did receive several measured photon doses, and although he received most of those doses in the period between 1974 and 1989, *see* HHS A.R. 2010, OCAS-TIB-007 provides no guidance on how to balance several measured doses against several missed doses, *see id.* at 2484.  And even assuming that the third criterion favors Still's husband, the regulation requires claimants to meet all its criteria, *see id.*, and Still never argues that her husband met the second.  As such, any error on the third criterion could not have altered the agency's decision.

Second, section 3.1 of OCAS-TIB-007 does not require NIOSH to consider claimants' ratio of shallow to deep photon doses.  *See* Pet'r's Reply at 13–15.  To be sure, section 2.2.2 of the regulation indicates that this ratio can indicate neutron exposure in certain areas of the Savannah site.  *See* HHS A.R. 2482–83.  But that section applies only to "neutron exposure prior to 1971."  *Id.* at 2481.  Still's husband began working at the Savannah site in 1974.  *See* Labor A.R. 166.  And although section 3.1 incorporates section 2.1 of the regulation by reference, *see* HHS A.R. 2484 (asking whether a work location is "noted in section 2.1"), it does not incorporate section 2.2.2, *see id.*  Accordingly, NIOSH approach to the ratio of shallow to deep photon doses was consistent with OCAS-TIB-007.

Third, the statement by a DOL health physicist, which DOL reproduced in denying Still's request for reconsideration, does not warrant setting aside NIOSH's dose reconstruction.  *See* Pet'r's Mem. in Supp. at 23–32.  At bottom, the statement simply endorses NIOSH's approach to the assignment of neutron doses.  *See* Labor A.R. 5–6.  And although the statement raises

additional arguments for that approach, *see id.*, the only issue in this case is whether *NIOSH* conducted a proper dose reconstruction.  This Court previously held that Still lacks standing to challenge DOL's adoption of her husband's dose reconstruction.  *See* Mem. Op. and Order of April 13, 2020, at 7.  Additionally, federal law requires DOL to adopt the reconstruction that NIOSH provides, *see* 20 C.F.R. § 30.318; 42 C.F.R. § 81.6, and there is no dispute that DOL has done so here.  Accordingly, it is hard to how any error in DOL's statement could affect the outcome of this case.

Finally, the Court does not find that NIOSH "ignore[d] the statutory and regulatory principle that encourages [it] to give workers the benefit of the doubt."  Pet'r's Reply at 10.  Although federal law requires NIOSH to resolve close questions in claimants' favor, this Court's review is governed by the deferential standard of *State Farm*, 463 U.S. 29.  Under that standard, although the Court must consider whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," the Court may not "substitute its judgment for that of the agency."  *Id.* at 43.  It follows that this Court may not reverse NIOSH's judgment on the set of close questions that are subject to the "benefit of the doubt" standard.  42 C.F.R. § 82.19.

For the reasons above, the Court holds that NIOSH complied with all its applicable regulations. This case thus contains no *Accardi* problem.

Further, the Court will not set aside the dose reconstruction as "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).  As noted above, review under section 706(2)(A) is "fundamentally deferential—especially with respect to matters relating to [an agency's] areas of technical expertise."  *Fox*, 684 F.3d at 75 (internal quotation marks omitted).  Here, the Court has already determined, first, that NIOSH applied the correct criteria in deciding whether to assign neutron

doses to Still's husband and, second, that the agency's decision had support on the record. Further, the Court has rejected Still's principal challenges to the dose reconstruction, which, although styled as *Accardi* arguments, also sound in section 706(2)(A).  Finally, upon thorough consideration of Still's briefing, the Court has not identified any "clear error of judgment" that would justify vacating NIOSH's highly technical determination.  *State Farm*, 463 U.S. at 43. Accordingly, assuming that Still has preserved a standalone arbitrariness or capriciousness challenge,[6] the Court holds that the challenge fails.

Finally, Still may not prevail on any challenge to NIOSH's regulations because she did not raise any challenge of that kind in her initial Petition, First Amended Petition, or Second Amended Petition.  Throughout her briefing, Still suggests that OCAS-TIB-007 is insufficiently generous to claimants.  *See*, *e.g.*, Pet'r's Mem. in Supp. at 26 ("Once a dose that should have been monitored is identified, the logical exercise of professional health physics judgment is to identify a monitored dose and use that dose as the basis for a claimant favorable overestimate."). But to the degree that Still intended to challenge the regulation itself, she may not raise that argument for the first time in her summary judgment motion.  *See Quinn v. Dist. of Columbia*, 740 F. Supp. 2d 112, 130 (D.D.C. 2010) ("It is well established that plaintiffs may not, through summary judgment briefs, raise new claims where such claims were not raised in the complaint.") (internal quotation marks and alterations omitted).  The same prohibition applies to her due process argument.  *See* Pet'r's Mem. in Supp. at 34.  Because none of Still's petitions

---

[6] The Court reads Still's Second Amended Petition to argue that NIOSH's dose reconstruction is arbitrary and capricious because it is inconsistent with the agency's guidance, not because it violates the EEOICPA or because it lacks "reasoned decisionmaking," *State Farm*, 463 U.S. at 52.  *See* Second Am. Pet. ¶¶ 69–111, 133.  And, as a general matter, plaintiffs may not raise claims in their summary judgment briefing that are absent from their complaints.  *See Quinn v. Dist. of Columbia*, 740 F. Supp. 2d 112, 130 (D.D.C. 2010).

mention either the Due Process Clauses or any authority discussing them, she may not raise a due process claim at this juncture.  *See Quinn*, 740 F. Supp. 2d at 130.

*           *           *

In sum, this case concerns whether a particular DOE employee was exposed to a particular kind of radiation over forty years ago.  NIOSH, which has extensive expertise in this area, reached a reasoned decision on this challenging and highly technical issue.  Although Still has standing to challenge the agency's decision, and although that decision constitutes final agency action, Still has not shown that NIOSH's decision is either inconsistent with the agency's regulations or otherwise unlawful.  For those reasons, the Court will grant the government's Cross-Motion for Summary Judgment, Dkt. 31, and deny Still's Motion for Summary Judgment, Dkt. 30.[7]

**CONCLUSION**

For the foregoing reasons, the plaintiff's Motion for Summary Judgment is denied in part and the defendant's Cross-Motion for Summary Judgment is granted in part and denied in part. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

September 30, 2021

---

[7] Given this disposition, Still's requests to "compel" particular actions from HHS and DOL are denied as moot.  Second Am. Pet. at 32.